May it please the Court, my name is Jared Cossaglad on behalf of the plaintiff appellant Brenda Quinn as administrator of the estate of her son Travis Fredrickson and I've requested five minutes for rebuttal and I'm here to make a decision granting summary judgment to defendants Rodman, Hammersley and Wexford Health Sources. I'm going to start with defendant Rodman. The undisputed facts are that according to the prisoner witnesses that Mr. Fredrickson complains to Mr. Rodman or a guard expressing suicidal feelings calling out for help and otherwise asking to see mental health practitioners. So let me just jump in right away. The district court and certainly the state argues that while there was testimony from some of these other prisoners on his block it was actually not as concise as you just characterized it. It didn't say I heard inmates so-and-so I heard you know Mr. Fredrickson ask Mr. Rodman for psych help. It's much vaguer you know there at some point somebody's yelling at some point people are hearing things but whether it's said to CO Rodman or not is quite unclear and that concerned the district court because there wasn't enough to trigger Rodman's responsibility to respond. Sure I'll address that first. So Rodman admits that he interacted with Mr. Fredrickson during the 10 p.m. count during which time these prisoners claimed that Mr. Fredrickson was expressing these kinds of feelings. But what does it mean? I mean does it mean he went to the front of the cell the way he was supposed to or does it mean he said I'm in here and fine or I'm in here and I'm not fine you know what what does it mean? Interacted is pretty broad. It means that he spoke with him and that's what he admits and what was exchanged during that interaction is a subject of a classic factual dispute because the prisoners claim at that time he was calling out for help loudly and Rodman says he heard nothing like that. I don't know that the prisoners are that precise in their timing that's what worries me and obviously it's a very sad case and there's no doubt about that but connecting what the prisoners were saying to what Rodman heard is essential before we can hold Rodman responsible for not taking further steps you know to address somebody's distress. And against the record evidence you know Rodman suggests that well maybe he didn't hear it maybe he was in a different part of the cell when he was making or the prison when he was making these complaints maybe it was too loud for him to hear. Do we know how big this general area is that Rodman was responsible for monitoring? I don't think that's in the record but in our view that's not material because he admits that he interacted and spoke with him at the 10 p.m. count when the prisoners claim Mr. Fredrickson was interacting with him and and the reason that I think you know the District Court's problem with the vagueness of the testimony was that she was unable from the record to determine the exact words that some of these prisoners used and that was occasioned by the fact that the prisoners were not deposed in the case and so their testimony was not officially made of record and if it was vague and the District Court didn't know or wasn't sure what testimony was you know we suggest that means the defendants didn't meet their burden to show their entitlement to summary judgment in the first place. Well Mr. Kosslick it's not just what was said it was when it was said correct because we don't necessarily have any record evidence that says that the statements being made by Mr. Fredrickson was at the same time that Mr. Rodman was present nor do we have record evidence that says the prisoners overhearing such So it's not just what was said it was when it was said correct? That's correct I mean obviously if if if he's making complaints to an empty space and the Rodman's not there to hear it then Rodman's not liable but again like you know our view is that these kinds of issues are factual disputes based on the record and I think that the affidavit of Michael Williams and again I haven't memorized it but does say that it was during the 10 p.m. count but even if he and for all intents and purposes the only record evidence is that he's in the general area where these prisoners are held if they're gonna come out and deny that the reason he didn't that it was some other guard who was there or responsible there's no evidence any other guards were in this area at the time the only evidence of any guard being there is Rodman so the only guard it could have been was Rodman and obviously you know if there's gonna be some kind of dispute over whether he heard it or not because he wasn't there you know there's no facts to support that so let me put it in a procedural way for you the defendants move for summary judgment they're entitled under the sell a text framework simply to point to a gap in in your side in in certainly in Miss Quinn side or mr. Frederick inside that is an essential element and if you can't show it then then you can't win so they don't have they don't have a burden of introducing evidence necessarily since they don't have the burden of proof on this point and the question then becomes whether miss Quinn acting for mr. Fredrickson has put enough in the record that a rational jury could say well we have an issue here you know is with their conversation about mental distress going on between Fredrickson and Rodman or not and the problem is that this may fall short even if he's banging on his cell door did Rodman hear him was he in the area how big was the unit how many other people were there what time is judge Brennan points out you know did this all happen so that's what at least has me concerned about this so from a procedural point of view have you gotten beyond that first step when the defendants move for summary judgment they say we don't think you can link up this communication with Rodman if Rodman has no idea then he can't be liable and and then what do you come back with right and I so I think that what we come back with is what I've already stated and I don't need to repeat it I know you don't um and and and the fact that you know and the fact that again they chose not to depose these witnesses and then you know they didn't really claim in the district court that there were ambiguities but why was it their prop why was it the state's problem to depose these witnesses he actually does there mr. mr. Rob I'm sorry that mr. Fredrickson his mom his mother needs they are the diff they don't have the burden of proof that's what I'm trying to attract be clear about I'm sorry yeah and that's you know look and at trial that's correct you know at trial we've disclosed witnesses we intend to call in summary judgment the defendant actually bears the burden to show that we have no and they have to do that by actually creating record evidence to show the court that what they can claim that there is no evidence I'm sorry judge I was just saying that was the issue in sell a text if they have the burden of proof and they want summary judgment they certainly have to develop evidence but they can come in and say we don't think you can prove knowledge if knowledge is a critical element or we don't think you can prove causation we don't think you can prove whatever it is and if they have pointed to the flaw in the plaintiff's case sell a check says they've discharged what they needed to do and and the onus of moving forward moves over to the party with the burden of proof here the plaintiff right and I guess I would just respond to that by saying the issue of when the statements were made to the guard on the chair where Rodman was working was not really an issue in the district court because what they actually raised was that there's no evidence to suggest Rodman's liability at all and they didn't even cite the affidavit of Michael Williams that was presented to them they don't cite any of the prisoner testimony in the district court briefing they just ignored the issue altogether and sought to shift the burden by making what was really an inaccurate claim that there was no record evidence they just didn't try to discover it and to some extent we have the same issue when we talk about Hammersley's liability because here you have life-and-death letters that she received that alerted her to the fact that you know Amanda Smith mr. Fredrickson's treater at Shawnee who she spoke to described these letters as effectively a suicide note you have dr. Burns our experts saying they're effectively a suicide note and Hammersley deny that and that's fine she denies knowing that it was suicide but that these letters were about suicide but she knew that she was he was at least an extreme emotional distress and she met with the warden and they decided to do nothing about it mr. Casa glad I'd like to focus in on this transfer from the second prison to the third prison does the record reveal why mr. Fredrickson was transferred from Jacksonville to Pinckneyville was it no substance abuse as a result of the needle in the shoe what was the reason for that I think it was June 17 transfer if the record shows I don't think that I don't know I don't think there is any evidence as to why he got transferred out of some segregation at Jacksonville to segregation at Pinckneyville but the needle I think was a was like a some kind of handcuff key they alleged right it wasn't like a drug needle was my understanding but well the reason why I raise this is the temporal sequence so June 30 arrives at June 10th he writes these letters June 17th he gets transferred June 27th is the date of the suicide so and at the one of the letters I think he makes reference to the fact that he does not want to do hard prison or real prison is there some type of a distinction here between the prisons with regard to the treatment he would be getting or the programming he would be getting I mean I think that's what he was referring to when he said he was afraid of going to Pinckneyville so you know it does kind of lead into this problem and the sequence of events that Wexford Health Sources has which is that there's no policies set up to deal with the interests of prisoners and how they're   and a severely mentally ill inmate transferring from one prison to another it's it's obvious that they're gonna need continuous complex coordinated care between their treaters it's not okay to just ship him out and then the people at the new facilities at Jacksonville and at Pinckneyville have no idea that he was just taken off suicide watch he's given no medical treatment for 25 days despite the fact that he was just suicidal and that is not just tragic I mean that's unconstitutional it strikes me as an overstatement to say no medical treatment if he was receiving his medications though and I do say I do distinguish that in the in the brief he received no medical treatment except for his medications so he was the medications were were delivered so I apologize and the medications were pretty clearly to anyone in the medical field these were psychotropic medications right that's what they were clearly their psychotropic medications and they clearly indicate that this man is severely mentally ill and a lot of the jail population which is part of the facts of the record at Pinckneyville is mentally ill and severely mentally ill this is not an uncommon problem for them to deal with which is why it raises questions about why none of the staff at Pinckneyville knew that he had this problem and Waxford doesn't even try to explain that you know they don't try to distinguish our argument that Dixon applies to this case where you have a widespread inaccurate medical records they don't even cite the glisten decision in their brief or try to rebut it well I mean there's some distinctions here but I want to go back I mean this one this woman Debbie Webb but by this time is he at Pinckneyville yet I guess he's still at Jackson she does a mental health evaluation accurately records that he's been on crisis watch accurately notes suicidal ideation and all of that and that information goes along to Nancy nope and LPN and Murray both evaluate suicide potential but they write yes they write two times in response to whether there have been previous suicide attempts so they know it well there's information that they gather once they're there but they what what happens is is the offender medical problem list which is the document the witnesses testify they rely on to look at whether or not what kind of problems these inmates suffered do not have these problems listed on it and that's undisputed so they're sending around these inaccurate medical records and that's where you have this report by dr. Shansky and dr. Stewart pointing out that this is the way the intra transfer system works on a widespread basis there is no accurate information there is no being transmitted on a widespread basis so they don't have the necessary tools they need I do want to reserve some time for rebuttal so I may have run out but I think the court and six seconds remaining miss Fritz please the court my name is Abby Fritz and I represent the athlete Wexford Health Sources Incorporated I just want to start off by saying that Quinn admittedly waived any argument related to the individual Wexford defendants and therefore there's no argument remaining that's right for the court as to any individual Wexford employees this is significant because Quinn does not therefore dispute the district courts ruling that no individual Wexford employee acted with deliberate indifference which is also consistent with Quinn's own expert dr. Burns who said that she has no criticisms of the individual Wexford employees and that there is no evidence that they deviated from the standard of care now as to Wexford the district court properly determined that there's no genuine issue of material fact left in this case and given that they also the district court also properly determined that there's insufficient evidence to demonstrate that any policy or procedure or as plaintiff alleges gaps related thereto or the moving force behind Fredrickson's suicide. So Ms. Fritz could you outline for me what policies were in place they don't necessarily have to I mean if IDOC has it as a policy I'll presume Wexford knows about that everybody doesn't have to repeat every policy but what policies were in place to assure continuity of care in these transfers? Okay yes of course your honor first of all I would like to point out that plaintiffs argument that there were no policies and procedures in place is wholly incorrect. As you can tell and it's been in the record I Wexford first follows IDOC policies and procedures and if there are any gaps related there to Wexford's policies and procedures will supplement. Now in this case and actually in all cases anytime there is a transfer of an inmate whether that be related to medical or mental health issues the transfer summary is to be completed first by the transferring facility then it is received by the receiving facility and filled out there. In addition anytime an inmate is transferred or actually anytime an inmate was received in a facility they must have a evaluation of suicide potential and that is also a policy or procedure. Now in addition to that these are written down somewhere this got put in the record or testified to or how do we know this? These are testified to specifically I can give you some of the citations if you would like to her deposition regarding the mental health evaluations the suicide potential what needs to be filled out and within that time frame. For example the mental health evaluation needs to be completed within 14 days of an inmate being added to the mental health caseload. For example when at Pickneyville as you can see that qualified mental health professional Stacy Murray she completed the evaluation of suicide potential which did include that plaintiff admitted he had had two suicide attempts including one this year so she was aware that he had a previous mental health history including attempted suicide but she added him to the mental health caseload that was on June 18th. Unfortunately Mr. Fredrickson committed suicide in the very early morning of June 27th so that was less than 14 days approximately 10 days little less therefore he didn't he was not there within that time frame that they're allotted to complete and based on the evaluations by Nancy Canope when she did the intake screening and by Ms. Murray that there was no indication that he needed expedited treatment that he was of an immediate suicide risk. In addition if you look at the transfer summary it clearly shows he's on psychotropic medication it shows that he had a history of suicide it also shows that he has history of mental health disorders including anxiety disorders therefore it's unclear what plaintiff would have you add to that that is fully necessary to have prevented Mr. Fredrickson's suicide which is why the key here is that there is no evidence presented by Ms. Quinn that any additional policies or procedures or any changes in the policies or procedures would have altered the course of events in this case and that is critical. This court in 2019 in the GAB case indicated that a plaintiff has failed to meet their burden of proof whenever there is no indication that any course of treatment would have alleviated the problem and that is analogous to this case. Therefore that is the insurmountable flaw in plaintiff's case. Plaintiff would like to focus on the policies and procedures themselves and ignore the fact that they have to have a connection they have to be that moving force in Mr. Fredrickson's Additionally, your honors, I would like to point out that a big issue with mental health and an opposite to medical treatment is that mental health revolves around recency. Plaintiff's own expert Ms. Burns, Dr. Burns, excuse me, stated that somebody can be suicidal one day or even one hour and not be suicidal the next. In addition, she's also that there's a degree of ambivalence and that once somebody makes up their mind it's almost impossible to stop that suicide and it's clear in the record and outlined in our brief regarding plaintiff cellmate Mr. Kane, plaintiff had a clear plan to commit suicide in this case and although tragic there is no evidence that that could have been prevented by any changes in policies or procedures. Additionally, your honor, I do want to bring up a little bit about the glisten and the Dixon case as plaintiff pointed out in his opening. First of all with Dixon that case is clearly distinguishable because not only does involve medical again which is significant distinction but in the Dixon case there were medical records but they were not scanned in. They were not readily available to the provider so even though the provider knew that medical records existed they had no ability to access them. That is not evidence in this case. In this case there is evidence that the medical and mental health records which again Dr. Burns has stated were complete that there was nothing significant missing from those mental health records that those were transferred to Jacksonville and then subsequently to Pickneyville. So the providers on-site did have the ability to look at those records which is distinguishable from Dixon. In regards to glisten, glisten is important for a very specific reason and glisten the defendant which was Corizon they admitted that they didn't have any policies or procedures in place rather they went solely by the standard of care which as this court stated resulted in a total lack of uncoordinated care. Again that's not the case here. The transfer summaries that is a policy or procedure that was in place and was completed in this case which contained all the relevant information or a summary of the relevant information related to Mr. Fredrickson's mental health enough to put the that he had mental health issues and to maybe dig deeper in those evaluations of suicide potential. Again in no instance was it evident that he needed expedited or immediate a mental health assistance and that is something that Dr. Burns did not disagree with. She said that the Wexford she was not critical of the actions by any of the Wexford defendants in this case. Your honors in conclusion plaintiff's argument is akin to the principle of race if solicitor or even strict liability. Although tragic that Mr. Fredrickson did commit suicide within the custody of the Illinois Department of Corrections it does not automatically equate to liability. As the courts previously stated in section 1983 claims including Monel claims that there is a very high burden of proof which in this case plaintiff has not met. Therefore we rest our case on our briefs and oral argument and we request that you affirm the district courts judgment in favor of Wexford. Thank you. Thank you Ms. Fritz. Ms. Buell. Good morning your honors and may it please the court. Caitlin Buell on behalf of state defendants Kristen Hammersley and Alexander Rodman. While this is an unfortunate case because it involves an inmate suicide the question here is whether the undisputed facts met the high standard for deliberate indifference under the 8th amendment. Deliberate indifference is more than negligence. To hold a defendant liable for deliberate indifference the plaintiff must show that he faced an objectively serious harm to his health or his safety and that the defendant was subjectively aware of that risk and intentionally disregarded it. In the context of an inmate suicide the plaintiff must show that the defendant was subjectively aware of an imminent risk of suicide and disregarded that risk. State defendants moved for summary judgment based on a lack of subjective awareness to Fredrickson's suicide risk. Quinn as the non-movement and the executor of this estate had the burden to come forward with specific facts showing that state defendants were subjectively aware of Fredrickson's record Quinn failed to meet her burden with respect to each state defendant. The record does not show that Rodman was subjectively aware of any suicide risk and under this court's decision in Matos a prison official cannot be subjectively indifferent to a risk of suicide if the inmate never makes that risk known to the official. So what about maybe you can respond to Mr. Kozleglad's argument that other inmates were willing to testify that they heard Mr. Fredrickson calling out for help after the 10 o'clock or around the time of the 10 o'clock check? Your Honor, the affidavit of Mr. Williams actually does not state a time specifically when the inmates were calling out or when a request was made and the record also doesn't contain anything from which to infer that Mr. Rodman overheard any requests for aid, any noises, how big the wing is, how many levels the wing is, where anything was or the timing and so all we have here is that Rodman as discussed on page 52 of his deposition never discussed any mental health issues with Mr. Fredrickson or received any request for help from him. Similarly, Hammersley was not subjectively aware of Fredrickson's current suicide risk. She was the social worker at Fredrickson's first prison, Shawnee, and after he was transferred she sent a detailed email about his mental health care and his recent crisis watch to Jacksonville, his second facility. She then had no further involvement in his care. When she received a letter containing letters from Fredrickson, she saw them in her professional opinion as a request for help and an advocate concerning segregation status, not a suicide note or a life-changing letter. She also took affirmative steps concerning the segregation request by promptly reporting these letters to her assistant warden. Of course the letters are ambiguous. I mean there's there's a tone of desperation in in those letters. Hammersley did note on page 8 of the document containing her deposition that it was indeed he was anxious, he was clearly very upset, but overall she thought it was a request for help with the segregation status and staying at mental health and drug treatment, which was his stated goal, and was asking for assistance in that with her assistant warden. She, in her professional opinion, did not see this as a suicide risk. And this shows action, not indifference. Because neither state defendant was subjectively aware of the risk, we would ask that this court affirm the district court's judgment. But if this court were to find a constitutional violation here, it would indicate a change in and a lowering of the standard for deliberate indifference under the Eighth Amendment that would entitle state defendants to qualified immunity. If there are no further questions, we would ask that this court affirm the district court's judgment. Thank you. Thank you, counsel. Mr. Kosselblatt, anything further? I will Willie White says, told the investigators that it was at 10 o'clock. He's the witness who said the timing. I just checked our brief on that. Jody Legass says it was around 10 30. So there's that evidence in the record. And as far as the, um uh, but I guess we're just one minute. I'll just rest on the arguments I previously made. I have nothing further to add. Thank you. Thank you very much. The case is taken under advisement.